Robert G. Sugarman
Yehudah L. Buchweitz
WEIL GOTSHAL & MANGES LLP
767 Fifth Avenue
New York, NY 10153
(212) 310-8184

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

JEWISH PEOPLE FOR THE BETTERMENT OF
WESTHAMPTON BEACH, ARNOLD SHEIFFER,
and ESTELLE LUBLINER,

                    Plaintiffs,

      -against-

THE VILLAGE OF WESTHAMPTON BEACH,
EAST END ERUV ASSOCIATION, VERIZON
NEW YORK INC. and LONG ISLAND LIGHTING
COMPANY d/b/a LIPA,
                    Defendants.

Index No. CV 12-3760

## MEMORANDUM OF LAW IN SUPPORT OF DEFENDANT
## EAST END ERUV ASSOCIATION'S MOTION TO DISMISS

# TABLE OF CONTENTS

Page

PRELIMINARY STATEMENT ...............................................................................1

STATEMENT OF FACTS....................................................................................4

    A.    Parties..............................................................................................4

    B.    EEEA Members and Others Sincerely Believe That An Eruv is Required............................................................................................4

    C.    EEEA Seeks to Establish the Eruv Through Contracts With Verizon and LIPA ...................................................................................6

    D.    Interference of the Municipalities and Others Lead EEEA to File a Lawsuit............................................................................................6

    E.    JPOE's Discriminatory Campaign Against the Eruv and Observant Jews...............................................................................................7

GOVERNING LEGAL STANDARD ON A MOTION TO DISMISS .......................8

ARGUMENT....................................................................................................9

I.    PLAINTIFFS LACK STANDING TO PURSUE THEIR CLAIMS ................9

    A.    Requirements for Establishment Clause Standing.....................................10

    B.    Plaintiffs Lack Taxpayer Standing.............................................................11

    C.    Plaintiffs Are Not Directly Affected by Any Government Action............12

II.    EVEN IF PLAINTIFFS HAD STANDING, THEY FAIL TO STATE A CLAIM UPON WHICH RELIEF CAN BE GRANTED. ............................14

    A.    The Establishment Clause Is Not Implicated by Creation of the Eruv................................................................................................14

    B.    Even If the Establishment Clause Applied, There Is No Violation ...........15

        1.    The Eruv Does Not Violate the Endorsement Test...................................16

        2.    The Eruv Does Not Violate the *Lemon* Test............................................18

            a.    Creation of the Eruv Serves a Secular Purpose .............................18

            b.    Creation of the Eruv Neither Advances Nor Inhibits Religion..........................................................................................20

            c.    Creation of the Eruv Does Not Risk Excessive Entanglement ................................................................................21

    C.    The Eruv Would Be a Reasonable Accommodation Under the Establishment Clause..............................................................................22

CONCLUSION .................................................................................................24

# TABLE OF AUTHORITIES

**Page(s)**

CASES

*ACLU v. City of Long Branch,*
    670 F. Supp. 1293 (D.N.J. 1987) .................................................................. passim

*Amidax Trading Grp. v. S.W.I.F.T. SCRL,*
    671 F.3d 140 (2d Cir. 2011) ................................................................................9

*Ariz. Christian Sch. Tuition Org. v. Winn,*
    131 S. Ct. 1436 (2011) ......................................................................................11

*Ashcroft v. Iqbal,*
    556 U.S. 662 (2009) ............................................................................................9

*Capitol Square Review & Advisory Bd. v. Pinette,*
    515 U.S. 753 (1995) ..........................................................................................16

*Commack Self-Service Kosher Meats, Inc. v. Hooker,*
    680 F.3d 194 (2d Cir. 2012) .......................................................................15, 18

*Diehl v. Village of Antwerp,*
    131 F.3d 130 (2d Cir. 1997) ..............................................................................14

*Flast v. Cohen,*
    392 U.S. 83 (1968) ......................................................................................10, 11

*Freedom from Religion Found., Inc. v. Obama,*
    641 F.3d 803 (7th Cir. 2011) .............................................................................13

*Garber v. Legg Mason, Inc.,*
    537 F.Supp. 2d 597 (S.D.N.Y. 2008) ..................................................................1

*Good News Club v. Milford Central School,*
    533 U.S. 98 (2001) ............................................................................................16

*Lamont v. Woods,*
    948 F.2d 825 (2d Cir. 1991) ........................................................................10, 11

*Lemon v. Kurtzman,*
    403 U.S. 602 (1971) ................................................................................... passim

*Lujan v. Defenders of Wildlife,*
    504 U.S. 555 (1992) ..........................................................................................12

*Lynch v. Donnelly,*
    465 U.S. 668 (1984)................................................................................15, 16, 19, 22

*Makarova v. United States,*
    201 F.3d 110 (2d. Cir. 2000)..........................................................................................9

*Patane v. Clark,*
    508 F.3d 106 (2d Cir. 2007)...........................................................................................9

*Salazar v. Buono,*
    559 U.S. –, 130 S. Ct. 1803 (2010)..............................................................................19

*Skipping Fin. Servs. Corp. v. Drakos,*
    140 F.3d 129 (2d Cir. 1998)...........................................................................................9

*Skoros v. City of New York,*
    37 F.3d 1 (2d Cir. 2006)..........................................................................................18, 20

*Smith v. Cmty Bd. No. 14,*
    128 Misc. 2d 944 (Sup. Ct. Queens Cnty. 1985), *aff'd*, 133 A.D.2d 79 (2d Dep't
    1987) ...................................................................................................................... passim

*Smith v. Local 819 I.B.T. Pension Plan,*
    291 F.3d 236 (2d Cir. 2002)...........................................................................................9

*Staehr v. Hartford Fin. Servs. Grp., Inc.,*
    547 F.3d 406 (2d Cir. 2008).............................................................................................1

*Tenafly Eruv Ass'n v. Borough of Tenafly,*
    309 F.3d 144 (3d Cir. 2002)....................................................................................... passim

*United States ex rel. Kirk v. Schindler Elevator Corp.,*
    601 F.3d 94 (2d Cir. 2010)..............................................................................................9

*Valley Forge Christian Coll. v. Am. United for Separation of Church and State, Inc.,*
    454 U.S. 464 (1982)..........................................................................................10, 12, 13

*Van Orden v. Perry,*
    545 U.S. 677 (2005)......................................................................................................17

*Walz v. Tax Comm'n,*
    397 U.S. 664 (1970)......................................................................................................14

*Zelman v. Simmons-Harris,*
    536 U.S. 639 (2002)................................................................................................15, 16

iii

STATUTES

42 U.S.C. §§ 1983.................................................................................................6

OTHER AUTHORITIES

Fed R. Civ. P. 12(b)(1)..........................................................................................8

Fed. R. Civ. P. 12(b)(6)...........................................................................8, 9, 14, 15

U.S. Const. amend. I................................................................................................3

U.S. Const. art. III.................................................................................3, 10, 12, 13

Defendant East End Eruv Association ("EEEA") respectfully submits this Memorandum of Law in support of its motion to dismiss the Complaint of the Jewish People for the Betterment of Westhampton Beach, a/k/a Jewish People Opposed to the Eruv ("JPOE"), Arnold Sheiffer ("Sheiffer"), and Estelle Lubliner ("Lubliner") (collectively, "Plaintiffs").

## PRELIMINARY STATEMENT

Plaintiffs state that they "do not want to live in a community where their government . . . is reasonably seen and understood by them as endorsing particular religious beliefs and practices that they do not hold or which they affirmatively oppose." Complaint at ¶ 6, *Jewish People for the Betterment of Westhampton Beach v. The Village of Westhampton Beach*, No. CV-12-3760 (E.D.N.Y. Jul. 30, 2012) ("JPOE Compl.").[1] What Plaintiffs really mean—as reflected in dozens of public statements[2]—is that they want to keep Sabbath-observant Jews out of the Hamptons. For example, plaintiff Esther Lubliner recently said:

> If you need an *eruv*, this is just not the place. Why does the town have to change for certain people? There are other seaside communities. If you're Orthodox, know that not every place in the world is for you.[3]

Plaintiff Arnold Sheiffer has said:

---

[1] EEEA accepts JPOE's allegations as true solely for the purposes of the instant motion.

[2] The articles cited herein are matters of public records, and this Court is entitled to take judicial notice that the statements contained therein have been publicly asserted. *See, e.g., Staehr v. Hartford Fin. Servs. Grp., Inc.,* 547 F.3d 406, 424–25 (2d Cir. 2008) (holding that district court properly took judicial notice of and considered media reports on a motion to dismiss because "the materials . . . were offered to show that certain things were said in the press."); *Garber v. Legg Mason, Inc.,* 537 F.Supp. 2d 597, 612 n.4 (S.D.N.Y. 2008) (taking judicial notice of newspaper articles).

[3] *See* Dkt. No. 135, *East End Eruv Ass'n v. The Village of Westhampton Beach,* No. CV 11-2013 (E.D.N.Y. Feb. 3, 2012) (the "EEEA Action") (Amended Complaint ("EEEA Am. Compl.")), Ex. O, , (Jennifer Barrios, *Nonprofit Gets Preliminary OKs for Hamptons Eruv*, NEWSDAY, Oct. 31, 2010) ("Newsday Article")).

> It's like social engineering. . . . We [the Jewish people] fought like
> hell to get out of the ghetto and now they want to create that
> again.[4]

Plaintiffs' true motivation—to keep observant Jews out of their neighborhoods—runs

directly contrary to the very fabric of American culture, tolerant as it has always been of the

many diverse religious views espoused by the American people. Indeed, even George

Washington said, in a 1790 letter to the Hebrew Congregation in Newport Rhode Island:

> The citizens of the Unites States of America have a right to
> applaud themselves for having given to mankind examples of an
> enlarged and liberal policy—a policy worthy of imitation. All
> possess alike liberty of conscience and immunities of Citizenship .
> . . [T]he Government of the United States, which gives to bigotry
> no sanction...requires only that they who live under its protection
> should demean themselves as good citizens. . . .[5]

Two hundred years later, our credo remains the same, as President George H. W. Bush observed

in a 1990 letter celebrating the creation of an eruv in Washington, D.C.:

> By permitting Jewish families to spend more time together on the
> Sabbath, [establishment of the Washington, D.C. eruv] will enable
> them to enjoy the Sabbath more and promote traditional family
> values, and it will lead to a fuller and better life for the entire
> Jewish community in Washington.[6]

Ignoring these fundamental precepts of religious liberty, Plaintiffs have for years waged

an all-out campaign—culminating in the filing of the present Complaint—to prevent EEEA from

establishing an eruv in Westhampton Beach and surrounding municipalities, a reasonable

---

[4] *See* Plaintiffs' Memorandum of Law in Opposition to Jewish People For the Betterment of
Westhampton Beach, Inc.'s Motion to Intervene ("EEEA Int. Opp."), Ex. N, EEEA Action,
(Sumathi Reddy, *Beach Community Divided by a Line*, THE WALL STREET JOURNAL, Jan. 13,
2011) ("WSJ Article").

[5] *See* Letter from George Washington to Hebrew Congregation in Newport, Rhode Island (Aug.,
1790), *available at* http://gwpapers.virginia.edu/documents/hebrew/reply.html.

[6] *See* EEEA Am. Compl., Ex. C (Letter from George H.W. Bush to Congregation Kesher Israel
(1990)).

accommodation of religious beliefs enjoyed by hundreds of Jewish communities across Long Island and across the nation without controversy. In so doing, the JPOE has sought to interfere with the fundamental right of EEEA, its members and other observant Jewish residents to freely practice their religion.

Plaintiffs couch their discriminatory intent in the language of the Establishment Clause of the First Amendment, and claim that an admittedly "nearly invisible" eruv would somehow amount to a "constant and ever-present symbol, message and reminder . . . that the secular public spaces of the Village have been transformed for religious use and identity." JPOE Compl. ¶ 1. Putting aside the ill logic of such a claim, Plaintiffs lack standing to assert it. Specifically, as demonstrated in Point I below, Plaintiffs fail to demonstrate that they possess either standing based on taxpayer status or standing based on direct injury caused by governmental action, as required by the federal courts for purposes of bringing an Establishment Clause claim. What Plaintiffs are left with—rank bias—is simply not a cognizable legal interest sufficient to confer standing under Article III of the U.S. Constitution. *See infra* Point I.

Even assuming that Plaintiffs had standing to pursue their hostile campaign against their neighbors, Plaintiffs' Establishment Clause claims should be dismissed because, as set forth in Point II below, every court to have considered the issue has found the establishment of an eruv does *not* violate the Establishment Clause.[7] As these cases have uniformly held, mere governmental acquiescence—and even affirmative assistance—in the creation of an eruv is a valid accommodation of religious practice under the Free Exercise Clause, not a violation of the Establishment Clause. *See infra* Point II. Indeed, to hold otherwise would represent a radical

---

[7] *See Tenafly Eruv Ass'n v. Borough of Tenafly*, 309 F.3d 144,176 (3d Cir. 2002); *ACLU v. City of Long Branch*, 670 F. Supp. 1293, 1295 (D.N.J. 1987); *Smith v. Cmty Bd. No. 14*, 128 Misc. 2d 944 (Sup. Ct. Queens Cnty. 1985), *aff'd*, 133 A.D.2d 79 (2d Dep't 1987).

3

departure from well-settled precedent, and would threaten the existence of dozens of *eruvin* throughout this jurisdiction. At bottom, Plaintiffs' Complaint is merely the latest tactic employed by a disgruntled group fueled by discriminatory intent, and not guided by any conceivable constitutional principle. The Complaint should be dismissed in its entirety.

## STATEMENT OF FACTS

### A.    Parties

The Plaintiffs in this action have sought for years to prevent the establishment of an eruv in Westhampton Beach and surrounding communities. The JPOE is a not-for-profit corporation organized and existing under and by virtue of the laws of the state of New York, the sole purpose of which is to achieve this end. JPOE Compl., ¶ 7. Plaintiffs Sheiffer and Lubliner are members of the JPOE, who are also opposed to establishment of the eruv. *Id.* ¶¶ 8-9.

Defendant EEEA is also a not-for-profit corporation formed and operating under the laws of the state of New York. *Id.* ¶ 11. Its members have entered into contracts with Defendants Verizon New York Inc. ("Verizon") and Long Island Lighting Company d/b/a/ LIPA ("LIPA") to establish an eruv according to the requirements set forth below. *Id.* ¶¶ 41-42. Nonetheless, Verizon and LIPA have thus far chosen not to issue licenses under those contracts due to the consistent opposition of Defendant Village of Westhampton Beach ("Westhampton Beach") and surrounding municipalities.

### B.    EEEA Members and Others Sincerely Believe That An Eruv is Required

Under Jewish law, an eruv is a largely invisible, unbroken demarcation of an area created by, among other things, using existing overhead wires, existing boundaries, and strips of wood or

plastic attached to the sides of certain poles ("lechis").[8] *See* JPOE Compl. ¶ 1 (noting the "nearly

invisible nature of the *lechis* and the other components of the eruv") (emphasis omitted). EEEA

members and other observant Jewish residents of the Village of Westhampton Beach, the Village

of Quogue ("Quogue"), and the Town of Southampton ("Southampton," and, together with

Westhampton Beach and Quogue, the "Municipalities") sincerely believe that they cannot carry

or push objects in the public domain on the Sabbath and Yom Kippur without an eruv. *See*

EEEA Am. Compl. ¶ 27. Consequently, without an eruv, persons who are in need of

wheelchairs cannot attend Sabbath services or go to the park or to a friend's house without

violating Jewish law. Families with small children who need to be pushed in strollers cannot

attend services or go to the park as a family without violating Jewish law. And, they cannot

carry items such as prayer books, prayer shawls, medicine, food, house keys, or personal

identification on the Sabbath and Yom Kippur outside of their homes. *Id.* ¶ 28. These

impediments greatly burden the religious and family life of EEEA's members and other

observant Jews in Westhampton Beach, Quogue, and Southampton.[9] *Id.* ¶ 29-33.

     EEEA, its members, and other observant Jewish residents of the Municipalities therefore

have sought to establish an eruv in Westhampton Beach and parts of Quogue and Southampton.

---

[8] A multitude of eruvin have been established nationwide and worldwide. There are hundreds of
eruvin in the United States and scores in New York State alone, including in Suffolk, Nassau,
and Westchester counties. EEEA Am. Compl. ¶ 2.

[9] Plaintiffs' suggestion that the Reform branch of Judaism has uniformly taken the position that
an eruv is a "'legal fiction' which is inconsistent with the true 'spirit' of Jewish law," JPOE
Compl. ¶ 3, misstates the position and has been refuted. If this case proceeds past the motion to
dismiss stage, which it should not, EEEA would prove through extensive evidence that this
position is flatly false. *See, e.g.,* Josh Lipowsky, *Same Battle, Different Front: Attorney
Champions an Eruv in the Hamptons, As He Did in Tenafly*, Long Island Jewish World, July 27,
2012, at 3, 14 (noting that "a letter from the Suffolk County Board of Rabbis, dated April 20,
[2012], in support of the eruv was signed by 13 Suffolk County rabbis across all
denominations.").

The eruv would be created by using already-existing overhead wires, natural boundaries, and by attaching lechis—slim, 5/8 inch half-round PVC staves (that can be painted any color) measuring no more than fifteen feet long—to certain existing utility poles in these three jurisdictions. *See* EEEA Am. Compl. ¶ 25. At present, however, EEEA has been unable to realize its goal of constructing an eruv. *Id.* at ¶114.

**C.    EEEA Seeks to Establish the Eruv Through Contracts With Verizon and LIPA**

EEEA entered into contracts with LIPA and Verizon on or about July 27, 2010 and August 16, 2010, respectively, under which Verizon and LIPA each agreed to issue licenses for the attachment of lechis to certain of their utility poles in Westhampton Beach, Quogue, and Southampton (the "Verizon and LIPA Agreements"). *See* JPOE Compl. ¶¶ 41-42.[10]

**D.    Interference of the Municipalities and Others Lead EEEA to File a Lawsuit**

Even though EEEA had fulfilled all of its legal obligations to establish an eruv, and notwithstanding the fact that no local law or ordinance would prevent EEEA from doing so, officials in the Municipalities have steadfastly opposed and interfered with EEEA's attempts to move forward. As a result, Verizon and LIPA were unwilling to issue licenses as required under their contracts with EEEA. Accordingly, in January of 2011, EEEA filed an action against Westhampton Beach, Quogue, and Southampton (i) asserting claims under, *inter alia,* the Free Exercise Clause, RLUIPA, and 42 U.S.C. §§ 1983; (ii) claiming tortious interference with contract; and (iii) requesting a declaratory judgment that there is no local, county, or state law or ordinance that prohibits the construction of an eruv in Westhampton Beach and parts of Quogue

---

[10] On or about June 13, 2011, EEEA and Verizon entered into an updated Pole Attachment Agreement For Miscellaneous Attachments. EEEA Am. Compl. ¶ 55.

and Southampton (the "EEEA Litigation"). *See* JPOE Compl. ¶ 44.[11] EEEA filed an amended complaint on February 3, 2012.[12] *See* EEEA Am. Compl.

### E.     JPOE's Discriminatory Campaign Against the Eruv and Observant Jews

In addition to moving unsuccessfully to intervene in the EEEA litigation (*see* Dkt. No. 150, EEEA Litigation) the JPOE has closely followed EEEA's attempts to put up an eruv, and has opposed the eruv at every step of the way. *See* JPOE Compl. ¶¶ 34-38 ("JPOE Opposed the Eruv"). Indeed, the JPOE's entire raison d'être is to prevent observant Jews from enjoying the benefits of an eruv. *See also* JPOE Compl. ¶ 34 (averring that JPOE's members "are opposed to the installation and establishment of an eruv within their communities").[13] JPOE now brings its own complaint, asserting claims for declaratory judgment, injunctive relief, and Establishment Clause violation.

The JPOE's continuous opposition to the eruv is rooted in bigotry and ignorance, as expressed by various public statements made by its members and officers—including the named plaintiffs in this litigation—which evince an open desire to keep Westhampton Beach free of

---

[11] Also in January 2011, Verizon and LIPA filed a separate action, currently pending, requesting (i) a declaration that they may permit lechis to be installed on utility poles without incurring any fines or other sanctions and without liability to the Municipalities; and (ii) an injunction preventing the Municipalities from interfering in any way with, or otherwise restricting or attempting to restrict, the installation of lechis (the "Verizon/LIPA Litigation"). *See* JPOE Compl. ¶ 46.

[12] In April 2011, EEEA filed a motion for a preliminary injunction against the Municipalities and certain of its officers, which was denied without prejudice as to Westhampton Beach and Quogue. *See* Dkt. No. 42, EEEA Litigation. Because these two municipalities continued to oppose EEEA's efforts to establish an eruv, EEEA renewed its motion for a preliminary injunction against both Westhampton Beach and Quogue in August 2012, and also moved for summary judgment on its declaratory judgment claim against Westhampton Beach. *See* Dkt. No. 177, EEEA Litigation.

[13] As the JPOE's publicly-available mission statement expressly states, "[w]e have come together to preserve and protect this secular community which has existed in harmony for generations." *See* EEEA Int. Opp., Ex. J.

observant Jews.  In addition to Mrs. Lubliner's and Mr. Shieffer's statements quoted above,

JPOE members have been quoted as stating:

- "This is a tough group to go up against, a group that wishes to reshape its communities to fit its religious fundamentalism, wherever it sets up shop, and has the wealth and legal clout to do what it has to do.  This is a group that is always looking out for its own self-interest first and at whatever the cost to the community around them."[14]

- "We're afraid of what this is going to bring in, black hats and ultra-Orthodox who come in and change the town like they did in Five Towns."[15]

- "Nobody wants to see this town fall like the others [*i.e.,* Tenafly, N.J. and Lawrence, N.Y.]. . . . Past history proves this will change the town."[16]

- "We want to continue as a secular village and our way of life . . . [unlike] what happened in Lawrence, Long Island, where the area was turned into an Orthodox [Jewish] area . . . ."[17]

These types of statements are just a few examples of the bigoted and exclusionary attitudes

routinely voiced by the JPOE and its members.  The present JPOE Complaint must be viewed

against this backdrop of animus and discriminatory resistance.

## GOVERNING LEGAL STANDARD ON A MOTION TO DISMISS

On a motion to dismiss pursuant to Federal Rules of Civil Procedure 12(b)(1) and

12(b)(6), the Court should "consider the Rule 12(b)(1) challenge first since if it must dismiss the

complaint for lack of subject matter jurisdiction, the accompanying defenses and objections

become moot and do not need to be determined."  *United States ex rel. Kirk v. Schindler*

---

[14] *See*  EEEA Int. Opp., Ex.M (Letter to the Press dated Jan. 27, 2011) (statements from JPOE website blog posts and open letters to the press)

[15] *See* WSJ Article (statement of JPOE member Mr. Kringstein).

[16] *See* EEEA Int. Opp., Ex. P (Kelly Carroll, *Westhampton's Anti-Eruv Group Claims 85 Percent of Village Opposed to Religious Designation*, HAMPTONS.COM, September 11, 2008) (statement of JPOE member Charlie Gottesman).  Mr. Gottesman has also stated that "[o]nce the [observant Jews] get a finger, they'll take an arm."  *Id.*

[17] *See* Newsday Article (statement of named Plaintiff Sheiffer).

8

*Elevator Corp.*, 601 F.3d 94, 102-03 (2d Cir. 2010). A case "is properly dismissed for lack of subject matter jurisdiction . . . when the district court lacks the statutory or constitutional power to adjudicate it." *Makarova v. United States*, 201 F.3d 110, 113 (2d Cir. 2000). Jurisdiction "must be shown affirmatively, and that showing is not made by drawing from the pleadings inferences favorable to the party asserting it." *Skipping Fin. Servs. Corp. v. Drakos*, 140 F.3d 129, 131 (2d Cir. 1998). On a motion to dismiss for lack of subject matter jurisdiction based on a lack of standing, the plaintiff "must allege facts that affirmatively and plausibly suggest that [he] has standing to sue." *Amidax Trading Grp. v. S.W.I.F.T. SCRL*, 671 F.3d 140, 145 (2d Cir. 2011).

A motion to dismiss for failure to state a claim pursuant to Rule 12(b)(6) of the Federal Rules of Civil Procedure tests the legal sufficiency of the party's claim for relief. *See Patane v. Clark*, 508 F.3d 106, 111-12 (2d Cir. 2007). The presumption of truth accorded to all well-pleaded facts in the pleading does not extend to legal conclusions. *See Ashcroft v. Iqbal*, 556 U.S. 662, 678-79 (2009) (citing *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007)). Moreover, "conclusory allegations or legal conclusions masquerading as factual conclusions will not suffice to prevent a motion to dismiss." *Smith v. Local 819 I.B.T. Pension Plan*, 291 F.3d 236, 240 (2d Cir. 2002).

## ARGUMENT

## I.   PLAINTIFFS LACK STANDING TO PURSUE THEIR CLAIMS

All five counts of Plaintiffs' complaint—(i) for a declaratory judgment against all defendants; (ii) for injunctive relief against all defendants; (iii) for nominal damages; (iv) for a declaratory judgment against LIPA; and (v) for an Establishment Clause violation against LIPA—are predicated on allegations of an Establishment Clause violation. *See* JPOE Compl. ¶¶

9

11-70. This Court does not have jurisdiction to consider *any* of these claims, however, because Plaintiffs have failed to allege that they have standing to assert any claim that is based on the Establishment Clause.

## A.    Requirements for Establishment Clause Standing

At a minimum, Article III of the United States Constitution requires a party seeking to invoke a federal court's jurisdiction to demonstrate that "(1) he personally has suffered some actual or threatened injury as a result of the putatively illegal conduct of the defendant; (2) the injury fairly can be traced to the challenged action; and (3) the injury is likely to be redressed by a favorable decision." *Lamont v. Woods*, 948 F.2d 825, 829 (2d Cir. 1991) (citing *Valley Forge Christian Coll. v. Americans United for Separation of Church and State, Inc.*, 454 U.S. 464, 472 (1982)). "If these constitutional minima are satisfied, a court may nevertheless deny standing for prudential reasons, as for example, because the asserted injury constitutes a 'generalized grievance' that is more appropriately addressed in the representative branches." *Id.*

In certain limited circumstances set forth below, standing in Establishment Clause cases may be established where the plaintiff is a taxpayer alleging that the government's exercise of its taxing and spending power violates the Establishment Clause. *See Flast v. Cohen*, 392 U.S. 83, 102-03 (1968); *Lamont*, 948 F.2d at 829-30. Plaintiffs may also establish standing where they are "directly affected by the laws and practices against which their complaints are directed." *Valley Forge*, 454 U.S. at 486 n.22 (quoting *Abington Sch. Dist. v. Schempp*, 374 U.S. 203, 224 n.9 (1963) (finding that parents and "impressionable schoolchildren" had standing to bring Establishment Clause claim against public school district that required daily prayer)). Here, Plaintiffs have not demonstrated standing under any theory.

10

### B. Plaintiffs Lack Taxpayer Standing

Federal taxpayer status is a sufficient basis for Establishment Clause standing only "if there is (1) a logical link between that status and the type of legislative enactment attacked; and (2) a nexus between that status and the precise nature of the constitutional infringement alleged." *Lamont*, 948 F.2d at 829 (citing *Flast*, 392 U.S. at 102). Thus, "a taxpayer will be a proper party to allege the unconstitutionality only of exercises of congressional power under the taxing and spending clause of Art. I, § 8, of the Constitution." *Flast*, 392 U.S. at 101. The Supreme Court has recently clarified that, under *Flast*:

> individuals suffer a particular injury for standing purposes when, in violation of the Establishment Clause and by means of the taxing and spending power, their property is transferred through the government's Treasury to a sectarian entity. The taxpayer's allegation in such cases would be that his tax money is being extracted and spent in violation of specific constitutional protections against such abuses of legislative power. *Flast v. Cohen* thus understands the "injury" alleged in Establishment Clause challenges to federal spending to be the very extraction and spending of tax money in aid of religion alleged by a plaintiff. *Such an injury is unlike generalized grievances about the conduct of government and so is appropriate for judicial redress.*

*Ariz. Christian Sch. Tuition Org. v. Winn*, 131 S. Ct. 1436, 1445-46 (2011) (emphasis added) (restricting the holding of *Flast* to an exceedingly narrow range of cases). The Second Circuit has noted that "in practice, the double nexus test established in *Flast* has been satisfied only in a small class of cases involving exercises of Congress's taxing and spending power that allegedly violate the specific constitutional limitation upon that power imposed by the Establishment Clause." *Lamont*, 948 F.2d at 830.

Plaintiffs here have not met the stringent requirements necessary to establish taxpayer standing because there has been no "extraction and spending of tax money in aid of religion." *Ariz. Christian Sch. Tuition Org.*, 131 S. Ct. at 1446. Indeed, nothing in the JPOE Complaint

even alleges that any public money would be spent on the eruv. Of course, no such allegation could be made because all expense related to the eruv is being borne by EEEA. Indeed, LIPA is paid a fee for every one of its poles to which EEEA affixes a lechi. *See,* Am. Compl., Ex. Q (License Agreement).

### C. Plaintiffs Are Not Directly Affected by Any Government Action

Plaintiffs likewise cannot establish standing here because the JPOE Complaint does not— and cannot—allege that Plaintiffs are "directly affected by the laws and practices against which their complaints are directed." *Valley Forge*, 454 U.S. at 486 n. 2. In *Valley Forge*, the Supreme Court specifically rejected the notion that plaintiffs can establish standing simply by claiming that the Constitution has been violated. *Id.* at 486. In that case, the Court held that plaintiffs had "fail[ed] to identify any personal injury suffered by them as a consequence of the alleged constitutional error, other than the psychological consequence presumably produced by observation of conduct with which one disagreed." *Id.* Mere psychological offense, according to the Court, "is not an injury sufficient to confer standing under Art. III, even though the disagreement is phrased in constitutional terms . . . standing is not measured by the intensity of the litigant's interest or the fervor of his advocacy." *Id.*

Here, the only form of purported injury that the JPOE invokes—besides its non-justiciable, generalized interest in preventing the government from purportedly violating the Constitution[18]—is the psychological harm that its members would purportedly experience in the

---

[18] *See Lujan v. Defenders of Wildlife*, 504 U.S. 555, 573-74 (1992) ("We have consistently held that a plaintiff raising only a generally available grievance about government—claiming only harm to his and every citizen's interest in proper application of the Constitution and laws, and seeking relief that no more directly and tangibly benefits him than it does the public at large—does not state an Article III case or controversy.").

future upon seeing lechis on utility poles in Westhampton Beach. As the JPOE Complaint alleges:

> The eruv, of course, will *not* go unnoticed; rather it will be a constant and ever-present symbol, message and reminder to the community at large, that the secular public spaces of the Village have been transformed for religious use and identity; to the non-Jewish residents, that the Village and LIPA have given preferred status to the Jewish religion as the only faith permitted to permanently affix religious symbols to utility poles within the Village or to physically demarcate certain public spaces with particular religious significant; and to large portions of the Jewish community within the Village, that one particular form of Judaism has been preferred and endorsed by the Village over another.

JPOE Compl. ¶ 1 (emphasis in original). The Complaint similarly alleges that "JPOE and its members do not want to live in a community where their government – i.e., the Village and LIPA itself – is reasonably seen and understood by them as enforcing particular religious beliefs and practices that they do not hold or which they affirmatively oppose." *Id.* ¶ 6; *see also id.* ¶¶ 5, 31-33. These allegations are nothing more than the exact type of "psychological consequence" and disagreements "phrased in constitutional terms" that the Supreme Court has held insufficient to confer standing. *See Valley Forge*, 454 U.S. at 486; *see also id.* at 473 ("The federal courts have abjured appeals to their authority which would convert the judicial process into 'no more than a vehicle for the vindication of the value interests of concerned bystanders.'") (citations omitted); *Freedom from Religion Found., Inc. v. Obama*, 641 F.3d 803, 807-08 (7th Cir. 2011) (Easterbrook, J.) ("[O]ffense at the behavior of the government, and a desire to have public officials comply with (plaintiffs' view of) the Constitution, differs from a legal injury. The 'psychological consequence presumably produced by observation of conduct with which one disagrees' is not an 'injury' for the purpose of standing.") (citing *Valley Forge*, 454 U.S. at 485). Accordingly, Plaintiffs lack standing to assert their claims.

13

## II. EVEN IF PLAINTIFFS HAD STANDING, THEY FAIL TO STATE A CLAIM UPON WHICH RELIEF CAN BE GRANTED.

Even assuming *arguendo* that Plaintiffs were able to establish standing, their claims would still fail because governmental accommodation of an eruv does not violate the Establishment Clause as a matter of law. Because each of Plaintiffs' causes of action is predicated on a purported Establishment Clause violation, *see* JPOE Compl. ¶¶ 49-70, the entire complaint must fail under Rule 12(b)(6) for failure to state a cause of action.

### A. The Establishment Clause Is Not Implicated by Creation of the Eruv

As the U.S. Supreme Court has observed, the Establishment Clause merely prevents the "active involvement of the sovereign in religious activity." *Walz v. Tax Comm'n*, 397 U.S. 664, 668 (1970); *see also Lemon v. Kurtzman*, 403 U.S. 602, 612 (1971) (noting that the Establishment Clause was intended to afford protection against "three main evils": sponsorship, financial support, and active involvement of the sovereign in religious activity). Here, Plaintiffs have made no allegation that any government action exists or is required. The Complaint does not—and cannot—allege that EEEA has ever requested that Westhampton Beach undertake *any* affirmative act with respect to the eruv. Rather, EEEA has merely asked that Westhampton Beach (and the other Municipalities) stand aside and allow EEEA to proceed under its lawful contracts with Verizon and LIPA without threat of fine or penalty. Governmental *inaction* is plainly not enough to give rise to an Establishment Clause violation. *See Diehl v. Village of Antwerp*, 131 F.3d 130 (2d Cir. 1997) ("'Plaintiffs' Establishment Clause claim fails because plaintiffs have not alleged a state action endorsing religion.'") (citing *Hsu By and Through Hsu v. Roslyn Union Free Sch. Dist. No. 3*, 85 F.3d 839, 866 (2d Cir.), *cert denied*, *Roslyn Union Free Sch. Dist. No. 3 v. Hsu By and Through Hsu*, 519 U.S. 1040 (1996)). Thus, there can be no violation of the Establishment Clause.

14

**B.**     **Even If the Establishment Clause Applied, There Is No Violation**

Even if, as Plaintiffs erroneously contend, the Establishment Clause applies, the JPOE

Complaint falls far short of asserting such a violation.

Every court to have considered the question of whether the Establishment Clause forbids

municipal approval of an eruv has uniformly held that it does not:  instead, such cases uniformly

hold that governmental action in connection with the creation of an eruv—and even affirmative

assistance (which is unmistakably not being sought in this case)—is a valid accommodation of

religious practice under the Free Exercise Clause, rather than a violation of the Establishment

Clause.  *See Tenafly Eruv Ass'n v. Borough of Tenafly*, 309 F.3d 144, 176 (3d Cir. 2002); *ACLU

v. City of Long Branch*, 670 F. Supp. 1293, 1295 (D.N.J. 1987); *Smith v. Cmty Bd. No. 14*, 128

Misc. 2d 944 (Sup. Ct. Queens Cnty. 1985), *aff'd*, 133 A.D.2d 79 (2d Dep't 1987).

Moreover, the eruv at issue easily satisfies any applicable test for determining an

Establishment Clause violation.  The Second Circuit has found that to survive a motion to

dismiss, plaintiffs must allege that the challenged government action (i) has no secular purpose;

(ii) has the principal or primary effect that either advances or inhibits religion, and (iii) fosters an

excessive government entanglement with religion.  *See Commack Self-Service Kosher Meats,

Inc. v. Hooker*, 680 F.3d 194, 205 (2d Cir. 2012) (citing *Lemon*, 403 U.S. 602) (dismissing

Establishment Clause claim on Rule 12(b)(6) motion to dismiss).  The applicability of the *Lemon*

test has been placed in doubt, however, by more recent Supreme Court decisions that have not

applied the *Lemon* test, but have instead employed the "endorsement test" articulated by Justice

O'Connor in *Lynch v. Donnelly*, 465 U.S. 668 (1984).  Under that test, the issue is whether a

reasonable, informed observer would perceive the challenged government action as endorsing

religion.  *See, e.g. Zelman v. Simmons-Harris*, 536 U.S. 639, 655 (2002); *Good News Club v.

15

*Milford Cent. Sch.*, 533 U.S. 98, 119 (2001); *Capitol Square Review & Advisory Bd. v. Pinette*, 515 U.S. 753, 780 (1995). Under either of these frameworks, it is clear that the creation of an eruv in Westhampton Beach and surrounding municipalities does not violate the Establishment Clause.

### 1.    The Eruv Does Not Violate the Endorsement Test

The endorsement test articulated by Justice O'Connor in *Lynch v. Donnelly*, 465 U.S. 668 (1984) asks whether a reasonable, informed observer would perceive the challenged government action as endorsing religion. *See, e.g.*, *Zelman*, 536 U.S. at 655; *Good News Club*, 533 U.S. at 119; *Capitol Square Review and Advisory Bd.*, 515 U.S. at 780. The Supreme Court has also made clear that "the endorsement inquiry is not about the perceptions of particular individuals," but rather stems from the view of a "reasonable observer aware of the history and context" of the dispute. *See Good News Club*, 533 U.S. at 119 (citations and quotations omitted); *Elk Grove Unified Sch. Dist. v. Newdow*, 542 U.S. 1, 34–35 (2004) (O'Connor, J., concurring) (any "subjective approach" whereby a government policy becomes unconstitutional because someone perceives it as an endorsement of religion "would reduce the test to an absurdity").

Here, any "reasonable observer aware of the history and context" of this well-publicized dispute would know that Westhampton Beach fought the creation of the eruv at every turn and would, therefore, know that it was not endorsing its creation. Thus, no reasonable, informed observer could possibly interpret the creation of the eruv as Westhampton Beach's endorsement of religion.

Similarly, as to LIPA,[19] any reasonable, informed observer would know that it has filed a lawsuit seeking a ruling by the Court that its performance of its contract with EEEA, among

---

[19] Verizon is a private company and its actions are not constrained by the Establishment Clause.

other things, would not subject LIPA to fines and other potential legal actions. And, LIPA has taken the position that it will not issue the licenses under its contract until the Court decides this issue. Thus, no reasonable, informed observer would conclude that LIPA's issuance of a license would be a violation of the Establishment Clause. *See* LIPA's Memorandum of Law in Opposition to Westhampton Beach's Motion for Summary Judgment and for a Preliminary Injunction in the matter of *Verizon New York, Inc. v. The Village of Westhampton Beach,* et al., Case No. 11-cv-252 (LDW) (AKT) ("LIPA Mem.").

Moreover, recent Supreme Court jurisprudence makes clear that the attachment of lechis to utility poles cannot constitute an Establishment Clause violation. Indeed, in *Good News Club,* 533 U.S. 98, the Supreme Court held that there would be no violation of the Establishment Clause if a school district permitted a private Christian organization for children ages 6-12 to hold its weekly meetings after school in an elementary school building. In *Van Orden v. Perry,* 545 U.S. 677 (2005), the Court held that the placement of a monument of the Ten Commandments on the Texas State Capitol grounds did not violate the Establishment Clause. If the placement of a Ten Commandments monument, which, as Justice Breyer pointed out in his concurring opinion, "undeniably has a religious message, invoking, indeed emphasizing, the Deity," *Van Orden,* 545 U.S. at 700, is not an Establishment Clause violation, it would strain credulity to suggest that a municipality's or utility's tolerance of a private entity's attachment of a small number of 5/8-inch PVC strips onto utility poles could constitute such a violation.

*Tenafly,* a case in which the Third Circuit employed the endorsement test to analyze this very issue, is instructive. In that case, the Third Circuit highlighted the "vital difference between purely private religiously motivated conduct and conduct initiated and sponsored by the government." *Tenafly,* 309 F.3d at 177. The court concluded that "[n]o reasonable, informed

17

observer would perceive the decision of the [Eruv Association] to affix lechis to utility poles owned by Verizon and to do so with Cablevision's assistance as a 'choice attributable to the State.'" *Id.* Importantly, the court observed, "even if there is some risk that a reasonable, informed observer might 'misperceive the endorsement of religion,' there is a much greater risk that the observer would perceive hostility toward Orthodox Jews if the Borough removed the lechis." *Id.* As in *Tenafly*, EEEA has entered into private contracts to carry out purely private religiously-motivated conduct. Westhampton Beach has been asked to do nothing but stand aside and cease interfering with those contracts. LIPA's performance of its contract, which will allow the EEEA, not LIPA, to put lechis on a small number of its poles is an accommodation, not an endorsement of religion.

### 2. The Eruv Does Not Violate the *Lemon* Test

As set forth above, the *Lemon* test requires that a challenged government act must (i) have a secular purpose; (ii) neither advance nor inhibit religion; and (iii) must not foster an excessive government entanglement with religion. *Lemon* at 612-13. As with the applicable endorsement test, an analysis under the *Lemon* test also makes clear that creation of the eruv does not violate the Establishment Clause.

### a. Creation of the Eruv Serves a Secular Purpose

The eruv serves a secular purpose. The Second Circuit typically accords deference to the government's proffered secular purpose so long as the reason is "genuine, not a sham, and not merely secondary to a religious objective." *Skoros v. City of New York*, 437 F.3d 1, 19-20 (2d Cir. 2006) (quoting *McCreary Cnty. v. ACLU*, 545 U.S. 844 (2005) (internal quotations omitted)); *accord Commack*, 680 F.3d at 206. Courts analyzing this very issue have held that the establishment of an eruv does, in fact, serve a secular purpose. *Smith*, 128 Misc. 2d at 947

(holding that "the policy of New York City to allow equal access to public lands for religious or non-religious purposes is an acceptable secular purpose") (citing *Lynch*, 466 U.S. 994; *Widmar v. Vincent*, 454 U.S. 263 (1981) and *McCreary v. Stone*, 739 F.2d 716 (2d Cir. 1984)); *Long Branch*, 670 F. Supp. at 1295 ("The city allowed the eruv to be created to enable observant Jews to engage in secular activities on the Sabbath.").  Moreover, the secular purposes served by eruvin have been lauded by public officials, including President George H. W. Bush, who has stated that "[b]y permitting Jewish families to spend more time together on the Sabbath, [establishment of the Washington, D.C. eruv] will enable them to enjoy the Sabbath more and promote traditional family values, and it will lead to a fuller and better life for the entire Jewish community in Washington."   EEEA Am. Compl., Ex. C; *see also* EEEA Am. Compl., Ex. D, (*Town of Oyster Bay Approves Expansion of ERUV for Jewish Community*, PLAINVIEW-OLD BETHPAGE HERALD, Feb. 29, 2009, (noting that citation presented by Town of Oyster Bay Supervisor John Venditto for expanded eruv recognized "the important role that The Young Israel of Plainview contributes to the community" and wished "all the members of The Young Israel of Plainview good health and blessings in the future on the expanded ERUV.")).  Indeed, any suggestion that the eruv lacks a secular purpose is difficult to understand in light of recent Supreme Court precedent discerning secular purposes in outright religious symbols such as the Latin Cross in *Salazar v. Buono*, 559 U.S. ___, 130 S. Ct. 1803, 1820 (2010) (holding that "the goal of avoiding governmental endorsement does not require eradication of all religious symbols" and noting that "Establishment Clause inquiries must take account of context and consequences").  The secular purposes of the eruv described above are much more compelling than those in *Salazar*.

b.     Creation of the Eruv Neither Advances Nor Inhibits Religion

Establishment of the eruv presents no risk of advancement or inhibition of religion.

Lechis are not "religious symbols that send messages to believers and non-believers alike." *See*

*Tenafly*, 309 F.3d at 164; *Long Branch*, 670 F. Supp. At 1296 ("[N]o religious symbol has been

erected. . . . The eruv sends no religious message to the rest of the community. Its existence

could not be discerned by anyone who has not been shown the boundaries. An eruv does not in

any way force other residents to confront daily images and symbols of another religion.").

Accordingly, the lechis do not amount to a public display of religion, such as nativity scenes or

crosses. They "merely accommodate[] the religious practices of those residents who are

observant Jews." *Long Branch*, 670 F. Supp. at 1296.

Further, this second prong of the *Lemon* test requires a court to make an assessment of

whether a reasonable observer would perceive the challenged action as "endorsement or

sponsorship of religion." *Skoros*, 37 F.3d at 29. This test "focuses upon the perception of a

reasonable, informed observer [who] must be deemed aware of the history and context of the

community and forum in which the religious display appears." *Id.*

Given this articulation of the standard, it is clear that no reasonable observer who is

familiar with the history and context of this matter, including the litigation that has occurred,

could possibly conclude that Westhampton Beach has endorsed religion. To the contrary, a

reasonable observer would be aware of the fact that the Village has taken no actions in support of

the eruv—and that in fact, the only position that Westhampton Beach has taken has been to

obstruct and oppose the establishment of the eruv, both publicly and in the context of this

litigation. Any other reasonable person not aware of the history and context of the eruv here

would merely see thin strips attached to the utility poles, alongside other objects the pole

20

supports and would not even know that they are part of an eruv. *See*, Dkt. No. 179, EEEA

Action, Ex. U (Preliminary Injunction Hearing, *East End Eruv Assoc. v. Village of Westhampton*

*Beach*, 11-cv-213 (E.D.N.Y.), Tr. 14:13-17, 18:15-19:4)..

      Similarly, no reasonable observer who is familiar with the history and context of this

matter, including the litigation that has occurred, could possibly conclude that LIPA has

endorsed religion by permitting the attachment of lechis to its poles. To the contrary, a

reasonable observer would know that LIPA took the position that it would not permit the lechis

to be attached to its poles absent a court order. Further, a reasonable observer who recognized

the lechis and who knew that the EEEA installed them in furtherance of its eruv would also be

aware that LIPA permits others to attach objects to its poles, and would conclude that, in

permitting lechis to be attached to its poles, LIPA would simply be acting in accordance with a

neutral practice applied to all applicants who seek licenses for making such attachments, and

thereby refusing to treat the EEEA differently. Thus, no reasonable observer would perceive

LIPA's action as endorsement of a particular religious practice.

      c.    <u>Creation of the Eruv Does Not Risk Excessive Entanglement</u>

      Finally, establishment of the eruv would not foster excessive entanglement with religion.

*Smith* and *Long Branch* are particularly instructive because those cases rejected Establishment

Clause challenges to municipality-approved eruvin even though the municipality in each case

had granted permission to the eruv planners to make alterations to public property in order to

create the eruv. *See Long Branch*, 670 F. Supp. at 1294 (noting that the city passed a resolution

"establishing the eruv and authorizing the Congregation to erect [two additional] poles and [a]

fence extension on public property" in order to do so); *Smith*, 128 Misc. 2d at 947 ("[T]he court

determines that the actions of the City agencies [which granted permission for plaintiffs to use

city lamp poles and to extend the height of sea fences to create an eruv] did not establish religion but were a valid accommodation to religious practice."). Here, by contrast, EEEA is not seeking to make any new erections or extensions of structures on public property, but rather seeks to simply attach thin, unobtrusive lechis to existing utility poles.

Further, Plaintiffs seek neither governmental financial assistance nor active support for the eruv. Westhampton Beach is being asked to do nothing more than not interfere with the eruv. As to LIPA, all that is required under its agreement with EEEA is to license space on some of its poles in the Municipalities for the attachment of lechis—conduct that is far less active than the types of governmental assistance of eruvin upheld by the courts in *Smith* and *Long Branch*. *See* EEEA Am. Compl., Ex. Q. Indeed, under the LIPA Agreement, EEEA would assume all responsibility—financial or otherwise—for the attachment, maintenance, and upkeep of the lechis. *Id.* Given the absence of affirmative governmental conduct here, there is simply no risk of excessive entanglement.

### C.    The Eruv Would Be a Reasonable Accommodation Under the Establishment Clause

Even assuming, arguendo, that the threshold "government action" requirement were somehow met here, courts that have addressed the issue have held that even an affirmative action by a governmental actor in support of an eruv constitutes a reasonable accommodation of religious practices and does not violate the Establishment Clause.

The Constitution does not "require complete separation of church and state; it affirmatively mandates accommodation, not merely tolerance, of all religions, and forbids hostility toward any." *Lynch*, 465 U.S. at 673 (emphasis added); *see also Lemon*, 403 U.S. at 614 ("Some relationship between government and religious organizations is inevitable."); *Smith* at 946 (noting that "there are necessary relationships between government and religion; that

22

government cannot be indifferent to religion in American life; and that, far from being hostile or even truly indifferent, it may, and sometimes must, accommodate its institutions and programs to the religious interests of the people.") (quoting Tribe, American Constitutional Law § 14-4, at 822 (1978)).

Cases involving the establishment of eruvin have consistently held that government acquiescence – and even affirmative assistance – in the establishment of an eruv is a valid accommodation of religious practice under the Free Exercise Clause, not a violation of the Establishment Clause. *See Tenafly*, 309 F.3d at 176; *Long Branch*, 670 F. Supp. at 1296; *Smith* at 946. In *Smith* and *Long Branch*, courts specifically rejected Establishment Clause challenges to municipally approved eruvin even though the municipality in each case granted permission to the eruv planners to make alterations to public property in order to create the eruv. *See Long Branch*, 670 F. Supp. at 1294 (noting that the city passed a resolution "establishing the eruv and authorizing the Congregation to erect [two additional] poles and [a] fence extension on public property" in order to do so); *Smith* at 947 ("[T]he court determines that the actions of the City agencies [which granted permission for plaintiffs to use city lamp poles and to increase the height of sea fences to create an eruv] did not establish religion but were a valid accommodation to religious practice.").

Here, Plaintiffs have not alleged that any such municipal assistance is requested, let alone the active assistance found permissible in *Long Branch* and *Smith*. Nonetheless, if any such assistance were requested, any action undertaken would plainly constitute a reasonable accommodation of religious practices.

## CONCLUSION

For all the foregoing reasons, EEEA respectfully submits that the Court should dismiss the complaint in its entirety.

Dated:    New York, New York
           October 29, 2012

/s/ Robert G. Sugarman
Robert G. Sugarman
Yehudah L. Buchweitz
WEIL GOTSHAL & MANGES LLP
767 Fifth Avenue
New York, NY 10153
(212) 310-8184

*Attorneys for Defendant East End Eruv Association*